UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RON GURANOVICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 C 3167 |
| | ) | |
| MICHAEL ASTRUE, | ) | Magistrate Judge Sidney I. Schenkier |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, the plaintiff, Ron Guranovich, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), seeks summary reversal and/or remand of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). The Commissioner has filed a cross-motion seeking affirmance of the decision denying benefits. For the following reasons, Mr. Guranovich's motion for reversal and/or remand is denied (doc. # 18), and the Commissioner's motion to affirm (doc. # 26) is granted.

## I.

We begin with a summary of the procedural history of this case. On July 25, 2005, Mr. Guranovich applied for DIB, alleging that he had been unable to work because of a disability beginning September 30, 1995 (R. 156). His application was denied initially on October 25, 2005, and upon reconsideration on December 29, 2005 (*Id.*). Mr. Guranovich filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on January 23, 2006, which was granted (R.

---

[1] On January 22, 2010, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 16).

185). A hearing took place before an ALJ on November 28, 2006 (R. 95). At the hearing, the ALJ heard from Mr. Guranovich; a medical expert ("ME"), Dr. Ashef Jillawar; and a vocational expert ("VE"), Thomas Gresick. On December 26, 2006, the ALJ issued a written decision denying Mr. Guranovich's application for DIB (R. 156). The ALJ held that Mr. Guranovich failed to show he was disabled under Sections 216(i) and 223(d) of the Social Security Act ("Act") through December 31, 2000, the date of last insured, and so was ineligible for DIB (R. 164). On February 12, 2007, Mr. Guranovich appealed the ALJ's decision, and on May 16, 2007, the Appeals Council denied the request for review (R. 87, 91).

Mr. Guranovich filed a complaint with the Northern District of Illinois, and by Joint Stipulation and Order, Magistrate Judge Ashman reversed the ALJ's decision and remanded the case (R. 1, Compl. at ¶ 4).[2] On March 5, 2008, the Appeals Council vacated the Commissioner's decision and remanded the case to the ALJ for a new hearing (*Id.* at ¶ 5). ALJ Armstrong held a supplemental hearing on July 24, 2008 (R. 21). At this hearing, the ALJ heard from Mr. Guranovich; an ME, Dr. Ellen Rozenfeld; and a VE, Tom Dunleavy (R. 23). On August 29, 2008, the ALJ issued a second written decision denying Mr. Guranovich's application for DIB (R. 5).

Mr. Guranovich again appealed the ALJ's decision to the Appeals Council. On March 26, 2009, after considering additional evidence – a letter from Mr. Guranovich's attorney arguing various grounds for reversal (R. 294-96) – the Appeals Council denied Mr. Guranovich's request for review (R. 1), making the ALJ's decision the final decision of the Commissioner under 42 U.S.C. § 405(g). *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

---

[2]No other information about the district court's decision to remand is available. The case number cited in Mr. Guranovich's complaint – 07 C 3288 – is incorrect. The parties do not dispute the ALJ's interpretation of the remand order, as discussed below.

## II.

We now summarize the administrative record. We set forth the general background and Mr. Guranovich's subjective medical complaints in Part A, followed by the medical record in Part B. In Part C, we discuss the testimony at the first hearing and the ALJ's subsequent written opinion, and in Part D, we address the second hearing before the ALJ and his second written opinion.

## A.

Mr. Guranovich was born on August 29, 1947 (R. 14). He is 6'2" tall and weighs 175 pounds (R. 220). He is married with no children (*Id.*). In 2004, Mr. Guranovich was living with his wife and his elderly mother (R. 490).

Mr. Guranovich served in the United States Army from 1966 to 1969, including service in the Vietnam War (*Id.*). He completed two years of college in 1974, and he has not completed any special job training or trade school (R. 226). He worked at a steel mill for twenty-five years, beginning as a courier from 1970 to 1982, then working as a computer operator of mainframe computers from 1984 to 1993, and then as a help desk worker for PCs and printers from 1993 to 1995 (R. 222). He retired and took a buyout from the steel mill on September 30, 1995 (R. 103-04). There is no evidence from Mr. Guranovich's employer that he had performance or disciplinary problems at work that led to his separation.

Mr. Guranovich went into business with his brother in 1995, providing the "front money" for a feed store for farm animals (R. 104). On the weekends, Mr. Guranovich would help out at the store (R. 105). After approximately six months, Mr. Guranovich "saw things happening [at the business] that I did not like. It was like [his brother] didn't trust people. Like the wife and I would be there and he wouldn't go home for 10 minutes. He would be calling me. . . ." (R. 105). The

3

business fell apart, with Mr. Guranovich blaming his brother and his brother blaming him, and Mr. Guranovich and his brother have not spoken since (R. 105-06).

According to Mr. Guranovich, he suffered worsening head tremors and post-traumatic stress disorder ("PTSD") in 1993 and 1995 (R. 221). He has trouble concentrating, starts projects but does not finish them, and is forgetful at times (R. 245). Mr. Guranovich often feels someone is watching and trying to harm him: he is hyper-vigilant, easily startled, does not trust anyone, and does not sleep well (R. 246). He is anti-social; he only has three friends (Vietnam veterans) whom he sees occasionally, and he leaves his home for about an hour each day to get his shopping done early to avoid crowds (*Id.*). He has been very sensitive to smells for the past twenty-five years, and this sensitivity has worsened each year (R. 259). Mr. Guranovich also reported that he has had tinnitus (a ringing in his ear) since he left the military in 1969, and it had been continuous for the previous three to four years before November 2003 (R. 560).

Mr. Guranovich is still very bitter about his experience in Vietnam, and slight noises give him flashbacks to the war (R. 265-67). Beginning in 1993, he would get upset every day at work when management or co-workers told him something or criticized him, which he attributed to "reminiscence of Nam officers and NCOs" (R. 247, 268). At one point, he wore his Vietnam flak jacket to work, and he was afraid he was going to hurt someone (R. 259-60).

His wife told him to get help, but instead he self-medicated with beer, and he did not care if he lived or died (R. 260, 268). Eventually, after two years of trying, his three friends convinced him to seek psychiatric help in 2003 (*Id.*).

One of Mr. Guranovich's friends, Michael Yurkovich Jr., filled out a "Function Report" on August 9, 2005. He wrote that Mr. Guranovich has difficulty with people, especially authority

figures; has trouble understanding, concentrating, and remembering; and is prone to flashbacks, hyper-vigilant, and very nervous (R. 230, 233). Mr. Guranovich is able to groom himself, cook, take medicine, clean the house, mow the lawn, garden, do wood-work, and handle his financial affairs (R. 230-32). He watches television, but avoids upsetting news about Iraq (*Id.*). Another friend, Ronald Camp, indicated in a July 20, 2003, letter that since 1988, Mr. Guranovich has been distrustful of people and government (R. 313). He feels that he has been treated unfairly, and he has a quick temper (*Id.*). In addition, at a July 2002 visit to Mr. Guranovich's house, Mr. Camp noticed that Mr. Guranovich started to sneeze, cough, and gag from the smell of perfume and cologne, and that Mr. Guranovich had head and hand tremors (*Id.*).

## B.

The medical record in this case consists of a handwritten note from 1969, documents from a treating chiropractor from 1991 through 1996, and records from Mr. Guranovich's doctors, counselors, and psychologists beginning in 2003 (R. 108). There are no records from his employer indicating any problems he experienced on the job (R. 15). We review the objective evidence in chronological order.

## 1.

We begin with the medical record prior to December 31, 2000, the date Mr. Guranovich was last insured. The earliest medical document in the record is a clinical consultation sheet from the summer of 1969, at the end of his tour of duty in the Army. The consultation sheet indicates that Mr. Guranovich had tremors, diarrhea, and shaking hands, and was nervous and easily upset (R. 297, 299). After 1969, the next documented medical treatment was from 1991 through 1996, when Mr. Guranovich visited chiropractor Nancy Mikus for generalized low back pain, which increased and

spread in 1995 (R. 300). Ms. Mikus noted that Mr. Guranovich attributed his headaches to stress at work and that "it appeared he had been traumatized by [his] experience" in Vietnam (*Id.*).

2.

The next medical documentation of any treatment or consultation by Mr. Guranovich is dated April 15, 2003, when he registered at the Chicago Heights Veteran's Center ("VA") with concerns of PTSD and other medical issues (R. 17). Mr. Guranovich began to receive counseling for PTSD from counselor Ignacio R. Ramos, MPA, at that time (R. 224-25).

On June 14, 2003, Dr. Hoo Kadhodaian, M.D., performed a psychiatric evaluation on Mr. Guranovich. Mr. Guranovich told Dr. Kadhodaian that he developed an uncontrollable head tremor five to six years prior and that he has anxiety and panic attacks (R. 366). Dr. Kadhodaian opined that Mr. Guranovich had a depressive disorder but that the criteria for PTSD were not met (*Id.*). Dr. Kadhodaian diagnosed Mr. Guranovich with alcohol abuse and Parkinson's disease, and he assessed Mr. Guranovich with a Global Assessment Functioning ("GAF") score of 65, indicating mild impairment in social and occupational functioning (*Id.*).

On June 30, 2003, Mr. Guranovich tested positive on a mood disorder screening test (R. 556). On July 2, 2003, a VA progress note indicated that Mr. Guranovich has head and hand tremors, and that when he is exposed to chemicals such as lotions, perfumes, and aerosols, he becomes congested and has trouble breathing (R. 312). On July 31, 2003, Mr. Guranovich saw an allergist, who reported that he appeared frail and pale, with marked head tremors, but the allergy tests were negative (R. 542-43, 555). He explained that when he is exposed to such chemicals, he gets the same sensation on his lips as when he was sprayed with Agent Orange during the Vietnam War, and he gets an upset stomach and has diarrhea (R. 542). On October 7, 2003, Mr. Guranovich also saw a dermatology

6

resident for his multiple chemical sensitivity disorder ("MCS"), which he reported began fifteen years ago and has been getting worse (R. 552).

Mr. Guranovich had a neurological examination on August 6, 2003. Neurology resident Dr. Mark Klingler Borsody noted a choppiness to Mr. Guranovich's voice, minimal hand tremors, and continuous head and voice tremors (R. 369-70; 652). Mr. Guranovich reported that his head and voice tremors began six years ago and have been getting worse over the last two years; they are worsened by high anxiety (*Id.*). Dr. Borsody opined that Mr. Guranovich had PTSD, likely anxiety disorder, and glaucoma (R. 369). Mr. Guranovich had started popranolol to alleviate the tremors but experienced side effects (R. 370). The report stated that there was no need for an MRI or further diagnostic tests (R. 653).

### 3.

On January 6, 2004, Mr. Guranovich met with Dr. Nada Mukoski (R. 493). The doctor reported that Mr. Guranovich had been diagnosed with hypercholesterolemia, microscopic hematuria, chemical hypersensitivity, panic/anxiety disorder, PTSD, ongoing head and hand tremor, glaucoma, and tobacco use disorder (*Id.*). Mr. Guranovich reported that he had been taking Popranolol since mid-November, but while his head tremor had not improved, he had developed pain in his knees, wrists, and hands (*Id.*). Dr. Mukoski noted significant head and voice tremor and mild hand tremor (R. 494).

On January 22, 2004, Dr. Ronald G. Ballenger, Ph.D., the Director of the Crown Point VA Clinic, met with Mr. Guranovich. Dr. Ballenger reported that Mr. Guranovich had symptoms of MCS, PTSD, anxiety and panic attacks, insomnia, and hypervigilance since serving in Vietnam (R. 303-04). He observed head tremors and difficulty with speech, and pain in Mr. Guranovich's wrists

and hands (R. 304). The report also noted that Mr. Guranovich had blood in his urine, possibly from his medications (R. 491). The report stated that Mr. Guranovich's thoughts were clear and articulate with no indications of psychotic process (R. 305). His judgment, concentration, memory, and sensorium were intact, with no ideation (*Id.*). The report also noted erectile dysfunction and neurological damage due to exposure to chemical agents (*Id.*). Dr. Ballenger assessed Mr. Guranovich with a GAF of 70 (R. 306). He recommended that Mr. Guranovich see Dr. Jonathon Goldman for medications to take the edge off his startle reactions, hypervigilance, insomnia and other aspects of anxiety associated with combat and related experiences (*Id.*).

On January 26, 2004, Mr. Guranovich met with psychiatrist Dr. Goldman, who noted that Mr. Guranovich is easily startled, has trouble with crowds and sleeping, and has MCS to perfumes, aerosols, fertilizer, and dust, whose symptoms were exacerbated since 9/11 and the Iraq war (*Id.*). Dr. Goldman observed a head tremor and hesitant speech (*Id.*). He assessed Mr. Guranovich with a GAF of 45, and prescribed a trial of Fluoxetine and Trazadone for depression (R. 311).

On February 27, 2004, Dr. Ballenger noted some improvement: Mr. Guranovich's sleep was more restful, he felt less edgy, and he was less prone to fly off the handle in everyday interactions (R. 643). On March 4, 2004, Mr. Guranovich continued to feel calmer, and his wife noticed improvement in his behavior and sleep (R. 641). Mr. Guranovich reported that the combination of counseling, psychotherapy, and medication have provided him with the best psychological state he has experienced in years (*Id.*). His symptoms fluctuated, however. On March 26, 2004, Mr. Guranovich complained again of poor sleep, hypervigilance, anxiety, and panic attacks (R. 481). On March 29, 2004, however, Mr. Guranovich was in excellent spirits, alert and oriented, but with mild to moderate head nodding and a slight voice tremor (R. 470).

8

Also on March 29, 2004, Mr. Guranovich had an audiology consultation regarding his ringing tinnitus, which had been intermittent since 1969, but constant for the last three to four years (R. 355). Conventional audiometry revealed normal hearing, but the audiologist did not attempt further intermittence to avoid worsening Mr. Guranovich's tremors (R. 477).

On May 21, 2004, Dr. Mukoski noted that Mr. Guranovich had been feeling "real good;" he had stopped drinking; and he had been "100% service connected for PTSD" (R. 466-67).[3] In addition, Prozac had helped diminish Mr. Guranovich's head shaking (*Id.*). On June 3, 2004, Dr. Goldman noted that Mr. Guranovich felt that the Fluoxetine and Temazepam helped him to be less anxious and angry (R. 465). Mr. Guranovich still had flashbacks, but he was able to talk himself down (R. 466). On June 4, 2004, Mr. Guranovich also reported improvement in his tinnitus with sleeping pills (R. 368, 462). On June 11, 2004, Prozac and Tamezepam continued to improve Mr. Guranovich's tremor (R. 367).

On June 17, 2004, Dr. Ballenger noted a voice tremor and occasional head tremor (less with distraction), and assessed Mr. Guranovich with a GAF of 45 (R. 631-32). On June 29, 2004, the visit with Dr. Ballenger was cut short because Mr. Guranovich was affected by perfume in clinic and was having breathing problems (R. 458). Nevertheless, as of July 12, 2004, Mr. Guranovich was still feeling better than he had in some years (R. 457). On July 27, 2004, Dr. Ballenger assessed Mr. Guranovich with a GAF of 52 (R. 564).

On August 24, 2004, Mr. Guranovich reported experiencing lethargy, intermittent insomnia, vertigo, and dizziness (R. 565). Dr. Ballenger assessed Mr. Guranovich with a GAF of 45 (*Id.*). On

---

[3]"Service-connected" compensation is provided for injury or disease which was suffered or contracted in the line of duty.

September 9, 2004, Mr. Guranovich was feeling somewhat better with psychotropic medications, but he was still lethargic (R. 454). Mr. Guranovich also stated that his legs got numb while standing and sitting (*Id.*). On October 26, 2004, Mr. Guranovich showed up to his appointment with Dr. Ballenger upset because he said he was tailgated on his way to the appointment (R. 451). Nevertheless, he reported that his anxiety was well-managed because of therapy and medication (*Id.*).

In November and December 2004, the combination of psychotherapy and medications diminished Mr. Guranovich's tremors and enhanced his ability to think and modulate anxieties, but his physical problems were getting worse (R. 442, 449-50, 571, 620). Mr. Guranovich reported pain in his wrists, low back pain, and numbness in his feet (R. 443, 450). On December 15, 2004, the radiologist noted a straightening of Mr. Guranovich's lumbar spine with narrowing of all lumbar disc spaces with osteoarthritis spurring and bony bridging in the lumbar vertebrae and scoliosis of the throacolumbar spine (R. 336). His GAF ranged from 45 to 55 during this time (*Id.*)

### 4.

Mr. Guranovich continued to receive psychotherapy from the VA clinic in 2005, during which his GAF continued to range between 45 and 55 (*see, e.g.*, R. 372, 377-78, 382, 572, 575, 577-78). During the first half of 2005, Mr. Guranovich's functioning and mental state continued to improve from the medications and psychotherapy (R. 379, 407). However, his physical problems, including pain and shaking in his hands and wrists, were getting worse (R. 271-72; 575-76). On February 9, 2005, a radiology report noted mild cerebral and cerebellar atrophy and a CT scan of Mr. Guranovich's chest noted a small nodule in the right lower lobe (R. 334-35). By September 15, 2004, a report noted that the nodule had not changed significantly in size (R. 337), but brain scans in June and September 2005 continued to show cerebellar and cerebral atrophy (R. 605, 613).

On July 8, 2005, Mr. Guranovich met with social worker Manuel Gonzales, LCSW. Mr. Guranovich became angry when Mr. Gonzalez suggested that his brain atrophy could have been caused from Mr. Guranovich's alcohol use in addition to Agent Orange (R. 374-75). On August 8, 2005, Dr. Ballenger opined that Mr. Guranovich's tremor, neuropathy and sensitivity to smell may be related to exposure to Agent Orange (R. 372).

On August 9, 2005, Mr. Guranovich's counselor, Mr. Ramos, noted that Mr. Guranovich's PTSD symptoms worsened in 2005, including worries about death, more realistic combat nightmares, and unexplainable outbursts of anger, which result in constricted range of affect, impairment of thought processes, difficulty concentrating and decision making, short term memory loss, and depression (R. 326). Mr. Ramos opined that Mr. Guranovich was unemployable (*Id.*). Mr. Guranovich had attended 110 weekly, voluntary individual therapy sessions (*Id.*).

On September 19, 2005, Dr. Alexander Panagos M.D., conducted a thirty-minute internal medicine physical examination of Mr. Guranovich for the Bureau of Disability Determination Services ("DDS") (R. 501). Dr. Panagos observed tremors of Mr. Guranovich's neck, head, and upper extremities, but cerebral testing was negative, cranial nerves II through XII were intact, DTRs were normal, and Mr. Guranovich produced sustained audible and understandable speech (R. 503). The report noted that Mr. Guranovich felt anxious in certain situations, but he had no difficulty performing daily activities such as driving (R. 501). Mr. Guranovich had no impairment with his hearing or back (R. 502-03). Dr. Panagos noted that Mr. Guranovich believed his tremors and MCS were secondary to exposure to Agent Orange (R. 502). Dr. Panagos diagnosed PTSD with anxiety and depression; head tremors and tremors of upper extremities, believed to be secondary to agent orange exposure; MCS; and hypercholesterolemia (R. 504).

11

Also on September 19, 2005, Dr. John Conran, M.D., performed a forty-five minute psychiatric evaluation of Mr. Guranovich for DDS, and he reviewed reports from the VA hospital prior to writing his report (R. 506). Mr. Guranovich informed Dr. Conran of his PTSD, dissension at home, and exposure to Agent Orange (R. 506-07). Mr. Guranovich related that he used to keep weapons under his pillow, and he once hit his wife when he woke up and thought he was in a combat situation (R. 506). Mr. Guranovich had never been hospitalized for psychiatric reasons but received weekly counseling and took Temazepam, Simvastin, Diazepam, Prozac, and Travetan (R. 507). He had problems at work because he had trouble taking directions, is watchful and somewhat paranoid (*Id.*). He will only grocery shop when the store is not crowded (*Id.*). Dr. Conran reported that Mr. Guranovich's mental status was cooperative, his behavior was appropriate, and his bodily activities at times were somewhat agitated (*Id.*). His mood was sad and his affective status was appropriate to content (*Id.*). Mr. Guranovich's speech was clear and understandable, with adequate conversation stream, though he had mild agitation in his psychomotor activity and obvious head and hand tremors (R. 506-07). Mr. Guranovich showed no indication of delusions, confusion, or hallucinations and had no problem with orientation, immediate memory, word/object recall, recent memory, insight and abstract thinking, calculations, judgment and insight, or responsibility (R. 508). Dr. Conran's diagnosis was: Axis I - PTSD; Axis II - deferred; Axis III - none (R. 509).

Dr. Ballenger filled out a mental impairment questionnaire on December 14, 2005. He noted that Mr. Guranovich met with a VA counselor every week, with a psychologist every two to four weeks, and with a psychiatrist every six to eight weeks (R. 528). He diagnosed Mr. Guranovich with: Axis I - General Anxiety Disorder, PTSD, and depression; Axis II - none; Axis III - neurological problems, hand and head tremors, smell hypersensitivity (due probably to exposure to

12

toxins in Vietnam, especially Agent Orange), glaucoma, atrophy of cerebellum; Axis IV - cannot work; Axis V (current GAF) - 45, Highest GAF in past year - 45 (*Id.*). Dr. Ballenger wrote that: "[t]hese Rx were extant for many years since discharge from Army" (*Id.*). He noted that Mr. Guranovich had: poor memory, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, perceptual disturbances ("visions of Viet Cong hiding in shrubs/bushes"), place disorientation, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, hostility and irrititability, and head/hand tremors (R. 529). For his clinical findings, he referred to the medical records, and noted "severe PTSD Rx and dysthymic behaviors" (*Id.*). Dr. Ballenger opined that Mr. Guranovich's impairments were reasonably consistent with his symptoms and functional limitations, and that he had stabilized emotionally with psychotherapy, psycho-pharmacotherapy, and medications (equivalents of Prozac, Restoril, and Valium), but he was still greatly troubled by PTSD (R. 530).

Dr. Ballenger opined that Mr. Guranovich cannot work and has not been capable of working since at least 1995, and that his impairments would cause him to be absent from work more than three times a month (R. 530-31). He gave Mr. Guranovich a prognosis of fair to poor due to the effects of Vietnam combat situations on Mr. Guranovich which gives him paranoia in crowds and an extreme startle response to loud noises (*Id.*). Dr. Ballenger rated all of Mr. Guranovich's "mental abilities and aptitude needed to do unskilled work" as fair, poor, or none (R. 532). Specifically, Dr. Ballenger opined that Mr. Guranovich had poor or no ability to: maintain attention for a two-hour segment, maintain regular attendance, carry out short simple instructions, respond to changes in work

13

setting, get along with co-workers, complete a normal workday, and deal with normal work stress (*Id.*). Dr. Ballenger referred to Mr. Guranovich's hypervigilance, chronic conflict, and panic responses, such as when he went to work wearing a flak jacket (R. 533). Dr. Ballenger also rated Mr. Guranovich's mental ability and aptitude to do semiskilled and skilled work as mostly poor or none, with no or poor ability to understand and remember detailed instructions, carry out detailed instructions, and deal with stress of work because Mr. Guranovich's "combat experience of being constantly mortared, in ability to sleep well, constant agitation with colleagues, chronic dysthymia, indicate vet has severe limitations" (*Id.*). Nor did Dr. Ballenger believe Mr. Guranovich could do "particular types of jobs" because his paranoia and fear overcome him in crowded places (R. 534).

Dr. Ballenger also opined that Mr. Guranovich's functional limitations would prevent him from working because he has marked restriction of Activities of Daily Living ("ADLs"); marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner; and repeated (three or more) episodes of deterioration or decompensation in a work or work-like setting (R. 534). Dr. Ballenger also wrote that Mr. Guranovich's MCS precludes him from entering areas with smells of chemicals, fumes, perfumes, and cologne because of his severe reaction, and his tremors interfere with his fine motor skills (R. 535). Dr. Ballenger stated that Mr. Guranovich's symptoms and limitations are not related to drug or alcohol abuse but probably started during his service in Vietnam and worsened with age (*Id.*).

On March 23, 2006, Dr. Goldman reported that Mr. Guranovich had to retire from work in 1995 because his PTSD symptoms – flashbacks, nightmares, trouble with authority, fear he might hurt someone – were interfering with his ability to function (R. 596-97).

14

## C.

We now turn to the first hearing before the ALJ, and the ALJ's subsequent written opinion.

## 1.

At the first hearing on November 28, 2006, the ALJ heard testimony from Mr. Guranovich, VE Gresick, and ME Jillawar (R. 97). Mr. Guranovich testified that he worked at the steel mill thirty years before taking a buyout in 1995 (R. 103-04). Before retiring, his workload increased without a corresponding pay increase (R. 102). He wore a flak jacket to work "as protection" in 1994 and 1995 because he was having flashbacks about people wanting to hurt him, and he saw his coworkers as his "enemy;" he feared he would hurt somebody or die on the job (R. 111-12). He had problems with his co-workers and supervisors during those years, and he thought one co-worker was a "backstabbing blankety blank" (R. 129). He raised his voice when he talked to his department head about that co-worker, and the department head felt threatened (R. 130-31). Mr. Guranovich also yelled at the co-worker, called him names, and said he would not have come back from Vietnam because Mr. Guranovich "would have taken care of" him (R. 133-34). In 1995, Mr. Guranovich's shakiness got worse, and he had to do his job (primarily using keyboards on PCs) a lot slower (R. 116).

Mr. Guranovich testified that when he came into contact with perfume, cologne, or cleaning agents, he tastes Agent Orange on his lips and has diarrhea (R. 114). It also attacks his nervous system, and he shakes (R. 115). Mr. Guranovich also has severe reactions to medications because of his chemical sensitivity, and he has not found a medicine to help with his tremors (R. 117). Mr. Guranovich also stated that he has some tinnitus, and Agent Orange caused him atrophy of the brain (R. 120). He takes care of his mother, cuts the grass, and goes shopping, but he does not socialize

with others (R. 124, 127-28). Mr. Guranovich's wife had pushed him to get help for ten years, and his Vietnam veteran friends had pushed him to get help from the VA since 2000 (R. 118, 135).

The ME testified that he had difficulty opining on Mr. Guranovich's residual functional capacity ("RFC") because there are no medical documents prior to 2003 (R. 142-43). The ME reviewed the evidence that Mr. Guranovich had an anxiety disorder and a sensory tremor affecting his head, neck and hands, that he took various medications (some of which he could not tolerate), and that he has cortical and cerebral atrophy (R. 140-41). Mr. Guranovich, however, had no focal neurological deficits and there was no effect on his cognition and no ataxia (R. 141-42). In addition, Mr. Guranovich had back pain and hypertension, but the ME opined that it would have no effect on his physical RFC (R. 141). The ME also opined that Mr. Guranovich's tremors would have no effect on his RFC because the tremors stop when he is working (R. 142-43).

The VE testified that Mr. Guranovich's past relevant work was as a computer operator or help desk person, which was semi-skilled and light in physical demand, and for which he sat down six out of eight hours (R. 144). The VE testified that a hypothetical individual who was limited to light exertional duties with only superficial contact with supervisors, co-employees, and the general public, and who needed a clean air environment, would not be able to return to past relevant work (R. 148). The VE testified that the hypothetical individual could perform other work in the economy as a small products assembler, for which there were approximately 8,500 jobs in the region or as a production assembler, for which there were about 6,500 jobs (*Id.*).

## 2.

In his first opinion, dated December 26, 2006, the ALJ determined that Mr. Guranovich was not under a disability within meaning of the Act from September 30, 1995, through the date of last

16

insured, December 31, 2000, and thus was not entitled to DIB (R. 156-57). Initially, the ALJ noted that Mr. Guranovich did not engage in substantial gainful activity during that time (R. 158).

The ALJ determined that through the date he was last insured, Mr. Guranovich had the following severe medically determinable impairments which caused significant limitations on Mr. Guranovich's work-related functioning: an essential tremor in his head, voice and arms due to exposure to chemicals and PTSD (R. 158). The ALJ noted that Mr. Guranovich's January 26, 2004, global assessment functioning ("GAF") score of 45 was indicative of serious symptoms or serious impairment (R. 159). However, the medical evidence of record established that Mr. Guranovich had no limitations in ADLs; mild limitations in social functioning; no limitations in concentration, persistence, or pace; and no episodes of decompensation or deterioration in a work-like setting (Id.). In addition, the nodule in Mr. Guranovich's CT chest scan was non-severe, with no more than minimal effect on his ability to do basic work activities (Id.).

The ALJ next determined that Mr. Guranovich's impairment or combination of impairments did not meet or medically equal one of the listed impairments. For physical impairments, the ALJ considered Listing 11.18 (cerebral trauma) (R. 159). For mental disorders, the ALJ considered Listing 12.06 (anxiety-related disorders). The ALJ found that Mr. Guranovich's depressive disorder did not satisfy the Paragraph "B" criteria in the Section 12.00 Listing of Impairments (Id.). The ALJ determined that Mr. Guranovich had no marked functional limitations in ADLs, social function, concentration, pace, or persistence, and no frequent episodes of decompensation or deterioration in a work-like setting (Id.).

In determining Mr. Guranovich's RFC, the ALJ reviewed and cited to Mr. Guranovich's medical records beginning on July 31, 2003 (R. 160). The ALJ noted Mr. Guranovich's MCS and

his head and hand tremors, yet his reported ability to perform ADLs without difficulty (*Id.*). The ALJ also reviewed Dr. Ballenger's December 14, 2005, report, Mr. Guranovich's subjective complaints, and the observations of his friends and family, including Mr. Yurkovich's letter (R. 161). The ALJ noted that on January 27, 2005, Mr. Guranovich's GAF improved to 55, indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning (*Id.*). Ultimately, the ALJ held that the objective medical evidence "does not fully support and is not consistent with the claimant's subjective complaints" (*Id.*).[4]

Looking at the Paragraph B criteria for Listing 12.06 (anxiety-related disorders), the ALJ found no limitations in ADLs and only mild limitations in social functioning (R. 161-62). In support, the ALJ explained that the evidence shows that Mr. Guranovich goes shopping early to avoid crowds, takes care of his elderly mom, goes out daily, and has a good relationship with his wife, although he has not spoken to his brother in over nine years (R. 162). The ALJ also determined that Mr. Guranovich had no limitations in concentration, persistence, or pace because he watches television, reads, does wood crafts, and gets around by himself (*Id.*). Further, the ALJ found no repeated episodes of decompensation of extended duration (*Id.*).

The ALJ concluded that "the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (R. 162). The ALJ relied on the conclusions of the DDS medical examiners and did not give "significant weight" to Dr. Ballenger's opinion that Mr. Guranovich has been unable to work since

---

[4] The ALJ states that the record is "replete with objective laboratory findings that establish a totally debilitating illness associated with his tremors" (R. 161). In light of the rest of the ALJ's opinion and his determination that Mr. Guranovich was not disabled, we presume that the word "replete" was a misstatement.

1995 due to symptoms from PTSD because it "is not well supported by the other substantial medical evidence of record" (R. 163).

The ALJ determined that Mr. Guranovich had the RFC: "to perform the exertional and nonexertional requirements of work, except for that more exertionally demanding than light work, frequently lifting and/or carrying 10 pounds, occasionally lifting and/or carrying 20 pounds, standing/walking for 6 hours in an 8 hour workday, and sitting for 2 hours in an 8 hour workday. Other limitations include no concentrated exposure to noxious fumes or other odors. Also, there are no limitations from his mental illness prior to the date last insured" (R. 160). The ALJ found that with this RFC, Mr. Guranovich could perform his past relevant work as a computer operator and/or help desk worker as actually performed (R. 163).

**D.**

On March 5, 2008, the Appeals Council remanded the case to the ALJ. We now address the second hearing and the ALJ's subsequent opinion.

**1.**

The second hearing was conducted on July 24, 2008 (R. 23).[5] Mr. Guranovich, his wife, ME Dr. Ellen Rozenfeld, and VE Thomas F. Dunleavy testified. At the outset, the ALJ explained that the purpose of the second hearing was to determine the severity of Mr. Guranovich's impairments prior to his date of last insured of December 31, 2000, despite the admitted absence of objective medical evidence prior to July 2003 (R. 23-24).

---

[5] Many of the relevant dates are incorrect in Mr. Guranovich's summary judgment brief (*see* doc. # 19: Pl.'s Mem. at 1-2).

Mr. Guranovich testified that his symptoms of PTSD started getting worse two years before he left his job, and that his PTSD was disabling as of the alleged onset date in 1995 (R. 26). He testified that he quit his job in 1995 because in 1994 he was transferred to Gary, and he did not get along with the people there, especially supervisors (R. 38-39). Mr. Guranovich felt that he wanted to "hurt somebody bad," and he was upset because he did not get a raise even though he did additional work (R. 40). His evaluations were worse in Gary (C's instead of B's) because he "wasn't afraid to open [his] mouth to supervision" (R. 42). He testified that the department head – a woman – felt threatened by him because he was "opening [his] mouth," wore his fatigue jacket, and kept his hands in his pocket (R. 42-43). He wore his flak jacket to work twice because he felt threatened and felt that people at work were his "enemy" (R. 43).

In 1999, Mr. Guranovich moved into a new house, and one time he ran around the perimeter with his gun (R. 30, 48). Certain things trigger panic attacks for him, such as torrential downpours (R. 45, 48). Mr. Guranovich testified that he has: neuropathy, atrophy of the brain, multiple chemical sensitivity, arthritis in his back and wrist, degenerating vertebrae, and glaucoma (but he can see with glasses) (R. 31). He used to drink several beers a day, quit drinking in February 2003 for four years, and now only drinks two to three beers a couple times a week (R. 33).

Mr. Guranovich testified that when he gets a haircut he starts having "head tremors" (R. 51). Perfumes, cleaning fluids, and certain chemicals affect his nervous and gastronomical systems, so that his hands shake, he vomits, and he has diarrhea (R. 57-59). He cannot take direction, does not like working with other people, has multiple chemical sensitivities, and has more bad days than good days (R. 61). On bad days, he feels drained and is just out of it (*Id.*). He takes Valium to calm himself and that helps a little bit (R. 61-62). He drives only once a month, to the Disabled American

Veterans meetings because he cannot handle the traffic or the people (R. 66). His anxiety and flashbacks to Vietnam are worse at night and in enclosed areas like elevators (R. 66-67). He is "service-connected" one-hundred percent for anxiety, depression, and PTSD (R. 68).

Mr. Guranovich's wife, Linda, talked about changes her husband went through after he was transferred to the Gary plant: his demeanor changed, he got meaner, and he would not take off his fatigue jacket (R. 52-53). She noted several instances of Mr. Guranovich having flashbacks. At one point in 1993 or 1994, she woke up to Mr. Guranovich's hands around her throat (*Id.*). One time they had company, and the sound of percolating coffee made him think of incoming rounds (R. 53). Another time Mrs. Guranovich did not dry her husband's blue jeans all the way, and he threw them at her and told her they stunk of Vietnam and she should re-wash them (*Id.*). She further testified that during heavy rains Mr. Guranovich sits in the garage and waits to be attacked by the Viet Cong, and he gets flashbacks when he gets a buzz cut at the barber (R. 48-50). She and her husband do not have sex or "really" sleep together anymore because she is afraid of his thrashing in bed at night with nightmares (R. 52). She stated that Mr. Guranovich does not trust her or anybody else, and he is getting more reclusive (R. 53).

The ME testified that the evidence showed that Mr. Guranovich initiated treatment in April 2003, and was diagnosed with PTSD in July 2003, with dysthymia (a type of depression) in March 2004, and with general anxiety disorder in September 2004 (R. 70). Although Dr. Ballenger opined that Mr. Guranovich has not been capable of work since at least 1995, when Dr. Ballenger saw him for the first time on January 22, 2004, he gave Mr. Guranovich a GAF of 70, which indicates only mild impairment (*Id.*). In June 2003, he was given a GAF of 65 by Dr. Kadhodaian (*Id.*). In 2004 and 2005, however, Dr. Ballenger gave him GAFs in the 40s (R. 71).

21

The ME testified that the medical evidence and testimony as to Mr. Guranovich's symptoms from 2003 forward meets Listing 12.06 with marked limitations in social functioning and marked limitations in concentration, persistence and pace (R. 71-72). The ME noted that the change in Mr. Guranovich's work setting (the move to Gary) could have triggered a deterioration in 1994, but she was unsure because there was no documentation from his employer indicating problems on the job (R. 72). In addition, Mr. Guranovich testified to triggers of his behavior going only as far back as September 11, 2001, and the Iraq War (R. 71).

The ME also noted that the medical record showed that Mr. Guranovich was responding well to treatment, feeling and behaving better in 2004 due to counseling and medication, despite an assessed GAF of 45 during this time (R. 73). The ME stated that even if the testimony of Mr. Guranovich and his wife were found credible regarding his behavior at work and the stressful move to Gary, she thinks "it's a stretch" to say the claimant would meet Listing 12.06 between his onset date and his date last insured because that is five years "of no file evidence and no real sense of the chronicity of the problems" (R. 75)

The VE testified that Mr. Guranovich's past relevant work was as a computer operator and help desk clerk, which is low-level skilled, sedentary work, and before that he was a master terminal operator (R. 77-78). The first hypothetical individual posed by the ALJ had no physical exertional limitations, but was limited to no concentrated exposure to noxious fumes, odors, respiratory irritants or extremes of humidity and no more than superficial contact with supervisors, co-employees, and the general public (R. 78). The VE testified that a hypothetical person would not be able to return to any of the past relevant work because of contact with co-workers (Id.). However, there would be other jobs in the regional or national economy. The VE testified that in 2000, Mr. Guranovich would

be able to perform light exertional jobs (R. 78-79). In "clean atmospheres" for a person who had to avoid even moderate exposure to noxious fumes or extreme humidity, there would be at least 2,000 to 3,000 assemblers jobs, and about 2,000 packagers jobs (R. 83). The VE noted, however, that all job places would likely need to be cleaned, and thus may have cleaning fluid odors (R. 84).

### 2.

On August 29, 2008, the ALJ issued his second written decision in this case. He stated that in its remand order, the Appeals Council directed him to: (1) obtain evidence from a medical expert to clarify the nature and severity of the claimant's mental and physical impairments prior to December 31, 2000; (2) give further consideration to the claimant's maximum RFC for the same period, and provide appropriate rationale with specific references to evidence in the record in support of the assessed limitations, considering all opinion evidence; and (3) obtain evidence from a VE to clarify the effect of the assessed limitations, based on the record as a whole, on the claimant's ability to perform past relevant work and on the occupational base. Before relying on the VE evidence, the ALJ must further identify and resolve any conflicts between the occupational evidence provided by the VE and information in the Dictionary of Occupational Titles ("DOT") (R. 7).

The ALJ again found that Mr. Guranovich was not under a disability within the meaning of the Act from September 30, 1995, through the date last insured, December 31, 2000 (R. 9). At Step 1, the ALJ found that Mr. Guranovich did not have any substantial gainful employment during that time (R. 10-11). At Step 2, the ALJ looked to the objective medical evidence of record to find that through the date of last insured, the claimant had the following severe impairments: tremors in his arms and head, generalized anxiety disorder, PTSD, depression, and multiple chemical sensitivities

(R. 11). Mr. Guranovich attributes many of his problems to the Vietnam War, including being sprayed with Agent Orange (*Id.*).

The ALJ found that the medical evidence of record did not support a finding that the following impairments were severe within the meaning of the Act: alleged neuropathy in his hands, atrophy of the brain, arthritis in his back and wrist, and degenerating vertebrae (R. 11). The ALJ pointed to a February 9, 2005 CT of Mr. Guranovich's brain, which showed only mild cerebral and cerebellar atrophy and no abnormal findings (*Id.*). In addition, although Mr. Guranovich received chiropractic treatment for his back from 1991 to 1996, an x-ray of the lumbar spine showed only narrowing of the lumbar disc spaces and osteoarthritic changes and bony bridging in the lumbar vertebrae (*Id.*). Also, although the record indicates that the Mr. Guranovich has neuropathy, the record does not contain results of objective medical testing indicating the severity of it (*Id.*). The ALJ determined that there is also no record support showing that these impairments significantly limit Mr. Guranovich's ability to perform work-related activities (*Id.*). Furthermore, the ALJ ruled that his glaucoma was non-severe because he could see with glasses, and the spot on his lungs was non-severe because CT scans showed a stable right lower lobe with no significant nodule (*Id.*).

At Step 3, the ALJ determined that through the date of last insured Mr. Guranovich did not have an impairment or combination of impairments that met or medically equaled a listed impairment (R. 11-12). The ALJ considered Mr. Guranovich's impairments under Listing 11.03 (epilepsy), Listing 11.06 (Parkinsonian syndrome), Listing 12.04 (affective disorders), and Listing 12.06 (anxiety-related disorders) (R. 12). Regarding mental impairments 12.04 and 12.06, the ALJ considered whether the "paragraph B" criteria were satisfied. *First*, the ALJ found only mild restriction in ADLs because Mr. Guranovich was able to care for himself, cook, clean, do household

repairs and yard work, care for his elderly mother (prior to her death in 2007), and drive and shop for food twice a week (*Id.*). *Second*, the ALJ found only mild difficulties in social functioning because Mr. Guranovich maintained relationships with his wife and several veteran friends, although he avoids crowds, has limited contact with other people, and had problems with co-workers and supervisors before he stopped working in 1995 (*Id.*). *Third*, the ALJ found only mild difficulties with regard to concentration, persistence, or pace because although Mr. Guranovich testified that he has problems with memory and concentration, he performs many activities that require a level of concentration such as household chores for himself and his mother and driving (R. 12-13). *Fourth*, the ALJ found that the record shows that Mr. Guranovich experienced no episodes of decompensation (R. 13). The ALJ also found that the "paragraph C" criteria were not met because Mr. Guranovich's symptoms were not so severe they rendered him completely unable to function independently outside his home (*Id.*).

Based on this evidence, the ALJ determined that Mr. Guranovich had the RFC to, through the date last insured, "perform light work (lift/carry 20 lbs. at most, 10 lbs, repetitively, stand/walk for at least 6 hrs. in an 8-hr. workday, sit 6 hrs. in 8 hr. workday). The claimant has no visual or communicative limitations. The claimant could have no concentrated exposure to odors, fumes, respiratory irritants or extremes of temperature or humidity. There are no limitations from his mental impairment prior to the date last insured" (R. 13). In making this finding, the ALJ reviewed the testimony as to Mr. Guranovich's tremors, PTSD, panic attacks, Vietnam flashbacks, hyper-vigilance, chemical sensitivity, reclusivity, and problems working with his co-workers and supervisors, particularly after transferring to a new job location (R. 13-15).

The ALJ stated that he "made every reasonable effort to obtain available information regarding the nature and severity of the claimant's impairments . . . concerning functional limitation prior to December 31, 2000" (R. 15). Ultimately, the ALJ found that while Mr. Guranovich's medically determinable impairments could reasonably be expected to produce the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they are inconsistent with the RFC assessment (*Id.*). As to his mental RFC, the ALJ reasoned that while Mr. Guranovich was observed with tremors and shaking hands and anxiety in 1969, "the record does not indicate that these symptoms continued throughout the years or that the claimant sought any further medical treatment for over 30 years, until 2003" (*Id.*). The ALJ further noted that Mr. Guranovich was able to work for nearly twenty-five years before 1995 with no evidence of worsening symptoms over time (*Id.*). As to Mr. Guranovich's physical RFC, the ALJ stated that the objective medical evidence of record supports a finding that he retained the RFC to perform work at all exertional levels with some limitations prior to December 31, 2000 (*Id.*). The ALJ pointed to a medical progress note from August 6, 2003, which indicated that Mr. Guranovich's head tremor began six years prior and worsened in the previous two years, and that he had mild hand tremors (R. 15-16). In addition, medical progress notes from June 11, 2004, and June 17, 2005, stated that Mr. Guranovich's tremors were "greatly improved" and stabilized with medication (*Id.*). The ALJ stated that the RFC accounts for some postural limitations from the tremors Mr. Guranovich experiences (R. 16).

The ALJ questioned the credibility of Mr. Guranovich's subjective complaints because his symptoms did not preclude him from undertaking a wide range of ADLs (R. 16). In addition, the ALJ did not give significant weight to the testimony of his wife "because it is not supported by a

26

preponderance of objective medical evidence of record," and her testimony may have been colored by her relationship to Mr. Guranovich. (R. 17).

The ALJ reviewed Dr. Ballenger's December 14, 2005, opinion that Mr. Guranovich was unable to work and had not been capable of working since at least 1995 (R. 17). The ALJ "accorded little weight to Dr. Ballenger's opinion regarding the claimant's functional capacity prior to December 2000 because it is not supported by the other substantial medical evidence of record" (*Id.*). The ALJ reasoned that Dr. Ballenger did not begin treating Mr. Guranovich until 2003, and "there is no indication that he obtained information regarding the claimant's impairments prior to that time other than through the claimant's reports" (*Id.*).

The ALJ also reviewed Dr. Kadhodaian's medical opinion (R. 16-17). Dr. Kadhodaian diagnosed Mr. Guranovich with depressive disorder but found that the criteria for PTSD were not met (R. 16). Dr. Kadhodaian assessed Mr. Guranovich with a GAF of 65, indicating that Mr. Guranovich's social and occupational functioning were only mildly impaired (R. 17).

Next, the ALJ reviewed the opinion of Mr. Guranovich's counseling therapist, Mr. Ramos, who opined that Mr. Guranovich's PTSD symptoms had worsened to the extent that he was unemployable (R. 17). Ultimately, the ALJ accorded Mr. Ramos's opinion "little weight because it indicates only that some of the claimant's symptoms worsened year, 2004" (*Id.*).

By contrast, the ALJ gave "considerable weight" to the opinion of Dr. Rozenfeld, the ME who testified at the disability hearing (R. 17-18). Dr. Rozenfeld opined that while the record supported a finding that Mr. Guranovich's mental impairment met the requirements of Listing 12.06 in 2003, there was insufficient documentary evidence of psychiatric disability prior to the treatment notes in 2003, which indicated significant worsening of Mr. Guranovich's condition only two years

prior (R. 16-17). The ALJ found that her opinion was supported by the objective medical evidence and testimony at the hearing (R. 18).

At Step 4, the ALJ found that the VE's testimony – that Mr. Guranovich had past relevant work as a computer operator and a master terminal operator, which was skilled work requiring sedentary and light exertion as performed – was consistent with the Dictionary of Occupational Titles ("DOT") (R. 18). The ALJ compared Mr. Guranovich's RFC with the physical and mental demands of his work, and found that Mr. Guranovich was able to perform his past relevant work as actually and generally performed through the date of last insured (*Id.*).

Nevertheless, the ALJ moved on to Step 5, and found that even if Mr. Guranovich's condition prevented him from performing his past relevant work, Mr. Guranovich would be able to perform other vocationally relevant jobs existing in significant numbers in the national economy prior to the date of last insured (R. 18-19). The VE had testified that an individual who was further limited to only superficial contact with supervisors, co-employees, and the general public would be unable to return to Mr. Guranovich's past work (*Id.*). The VE testified, however, that this hypothetical person would still be able to perform the following jobs: (1) assemblers with 15,000 jobs in the regional economy; and (2) packagers with 7,000 jobs in the regional economy (R. 19). The ALJ found this consistent with the DOT, and thus determined that Mr. Guranovich was not disabled as defined by the Act at any time from September 30, 1995, the alleged onset date, through December 31, 2000, the date last insured (R. 19-20).

### III.

We begin our review of the Commissioner's determination with the governing legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Furthermore, a claimant must show that his impairments prevent him from doing his previous work and from performing any other "kind of substantial gainful work" that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The claimant must establish that his or her severe impairment was disabling as of the date last insured. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005).

The social security regulations outline a five-step evaluation process for determining whether a claimant has a disability. 20 C.F.R. § 404.1520(a)(4). These steps, which must be evaluated sequentially, require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) any impairment listed in the appendix to the regulations as severe enough to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. 20 C.F.R. § 404.1520(a)(4). A negative finding at any step other than Step 3 precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The claimant has the burden of proof at every step except Step 5, where it shifts to the Commissioner. *Fischer v. Barnhart*, 309 F. Supp. 2d 1055, 1059 (N.D. Ill. 2004). If the claimant has a severe impairment that does not satisfy a listing at Step

3, the ALJ must determine the claimant's RFC to perform past relevant work. 20 C.F.R. § 404.1520(e). The RFC is used in Step 4 to determine whether the claimant can perform her past relevant work and in Step 5 to determine if the claimant can adjust to other work. 20 C.F.R. §§ 1520(f)-(g). If a claimant's RFC allows her to perform jobs that exist in significant numbers in the national economy, then the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision, the Court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Where supported by substantial evidence, the Court must accept the ALJ's findings of fact. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673. This means that the ALJ's findings must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* If conflicting evidence would allow reasonable minds to differ, the responsibility to determine disability belongs to the Commissioner – and the ALJ, by extension – not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Clifford v. Apfel*, 227 F.3d 863, (7th Cir. 2000) (holding that the ALJ, not the courts, resolves evidentiary conflicts).

That said, an ALJ is not entitled to unlimited judicial deference. An ALJ must "build an accurate and logical bridge from the evidence to [his or] her conclusion," *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), and "must confront the evidence that does not support his [or her] conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). In addition, the ALJ must articulate the reasons he or she rejected certain

evidence so that the reviewing court can ultimately assess whether the determination was supported by substantial evidence. *Id.* at 677-78; *see also Craft*, 539 F.3d at 673.

## IV.

Mr. Guranovich contends that the ALJ's determination that he is not disabled should be reversed because the ALJ improperly discounted his and his wife's credibility; incorrectly determined the onset date of his severe impairments; improperly found no limitations in his mental RFC prior to the date of last insured; failed to address VE testimony favorable to Mr. Guranovich; and failed to give sufficient weight to the opinion of Dr. Ballenger, Mr. Guranovich's treating psychologist (doc. # 19: Pl.'s Mem. in Supp. of Summ. Judgmt. at 1). We address each of these arguments in turn.

## A.

Mr. Guranovich first contends that the ALJ failed to give sufficient weight to the testimony of him and his wife.[6] "Although we afford an ALJ's credibility finding considerable deference and will overturn it only if patently wrong, the ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the credibility finding with specific reasons supported by the record." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (internal citations and quotations omitted). "[T]he ALJ may not discredit a claimant's testimony about [his or] her pain and limitations solely because there is no objective

---

[6] The ALJ found Mr. Guranovich's testimony as to the intensity, persistence and limiting effects of his symptoms "not entirely credible" (R. 162). The Seventh Circuit has recently noted that the phrase "not *entirely* credible," is "meaningless boilerplate" that "yields no clue to what weight the trier of fact gave the testimony." *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (emphasis in original). That is true when the ALJ stops there, and says no more. In this case, however, the reasons why the ALJ found the testimony "not entirely credible" was discussed in his opinion, which analyzed the testimony in comparison to other medical evidence in the record. *See Scott v. Astrue*, No. 08 C 5882, 2010 WL 1640193, at *11 (N.D. Ill. Apr. 22, 2010)

31

medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). If an ALJ finds that a claimant lacks credibility, he may disregard or discount a claimant's assertions. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

## 1.

In his written opinion, the ALJ reviewed Mr. Guranovich's testimony that "he was unable to work due to his tremors and post-traumatic stress disorder, which resulted from his service in the Vietnam War, worsening over time until he could no longer work in 1995" (R. 14). The ALJ noted that Mr. Guranovich testified that his head and hand tremors got worse in 1995, and his PTSD "got bad" in 1993, including panic attacks and flashbacks to Vietnam (*Id.*). In addition, he had problems working with his co-workers and supervisors, particularly after transferring to his new job location in Indiana (*Id.*).

The ALJ did not find Mr. Guranovich's testimony as to his symptoms during the relevant time period to be credible (R. 15). The ALJ reasoned that Mr. Guranovich did not seek treatment for over thirty years, until 2003, and that he worked for nearly twenty-five years before retiring in 1995, with no evidence from his employer indicating any problems on the job (*Id.*). Furthermore, Mr. Guranovich performed a wide range of ADLs between 1995 and 2003, including caring for his elderly mother and driving to the store (during non-rush hours) to shop (R. 14). We note that Mr. Guranovich's testimony about his problems at work (unsubstantiated by any evidence from his employer) focused on his displeasure with one particular job at one particular location – Gary, Indiana – where he felt uncomfortable. The ALJ was entitled to decide that those problems would not generally apply to employment at other locations, as there is no evidence that Mr. Guranovich had problems while working at the other steel mill location or assisting his brother in running the

32

feed store in 1995. On this record, there was substantial evidence for the ALJ to find not credible Mr. Guranovich's testimony that his symptoms had worsened to the point where he was unable to perform all work-related activities in 1995 (R. 15-16).

Mr. Guranovich argues that the ALJ improperly focused exclusively on his ability to perform ADLs and did not consider how his mental impairments might affect his ability to work. Indeed, the Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home," because "[t]he pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Mr. Guranovich also argues that the ALJ improperly discounted Mr. Guranovich's testimony because his symptoms appears "episodic rather than constant" (Pl.'s Mem. at 5-6). The Seventh Circuit has held that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days," but if the person is not well enough to work half of the time, he or she could not hold down a full-time job. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).

In this case, however, the ALJ's credibility finding was grounded on more than the ADLs performed by Mr. Guranovich and the allegedly episodic nature of his impairments. In this case, as in *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008), the ALJ's credibility finding was grounded in the lack of evidence available with respect to Mr. Guranovich's condition during the critical period prior to his date last insured. As in *Eichstadt*, "it is hard to imagine what else the ALJ could have done." *Id.* "The claimant bears the burden of producing medical evidence that supports [his]

claims of disability. That means that the claimant bears the risk of uncertainty, even if the reason for the sparse record is simply a long lapse of time." *Id.*

Indeed, "infrequent treatment . . . can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment. However, the ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care. " *Craft*, 539 F.3d at 679 (citing SSR 96-7p) (internal quotations omitted). Here, the ALJ did explore Mr. Guranovich's explanations as to his lack of medical care prior to 2003 as well as his treatment and medications after 2003 (R. 15). Mr. Guranovich explained that he did not seek care earlier because he did not listen to his friends or his wife when they urged him to seek treatment prior to 2003 (*Id.*). The ALJ was entitled to infer that if indeed Mr. Guranovich was unable to work because he had serious PTSD symptoms, MCS, and tremors, wanted to hurt people at work, and wore his fatigue and flak jacket to work at times, he would have sought treatment earlier or there would have been some document indicating problems at work.

**2.**

Mr. Guranovich also argues that the ALJ improperly discounted his wife's testimony (Pl.'s Mem. at 7-8). The ALJ noted that Mrs. Guranovich testified that her husband has flashbacks to Vietnam when it rains or when he gets his haircut, and that his demeanor worsened when he transferred to Gary for his job and he wore his army fatigue jacket to work regularly (R. 14-15). The ALJ discounted her testimony because "she is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms" and because "by virtue of her relationship as the claimant's wife, Mrs. Guranovich cannot be considered a disinterested third

party witness whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges" (R. 17). In addition, the ALJ held that "[m]ore importantly, significant weight cannot be given to her testimony because it is not supported by a preponderance of objective medical evidence of record" (*Id.*). Mr. Guranovich argues that these were improper standards by which to measure Mrs. Guranovich's credibility (Pl.'s Mem. at 7-8).

As a lay witness, Mrs. Guranovich is not expected to have medical training or to be a "disinterested" witness. The ALJ's credibility determination as to Mrs. Guranovich's testimony, however, did include specific reasons showing that the determination was "not patently wrong, is supported by substantial evidence, and is sufficiently detailed that we are able to trace its path of reasoning." *Schmidt*, 395 F.3d at 747. As noted above, the ALJ questioned Mrs. Guranovich's ability to recall the exact dates of onset of Mr. Guranovich's symptoms of PTSD, and the ALJ found the absence of objective medical evidence or documented problems at work during the relevant time period to be a more credible reflection of Mr. Guranovich's symptoms at the time (R. 17). Accordingly, the ALJ's credibility determination did not constitute reversible error.

**B.**

Mr. Guranovich also argues that the ALJ improperly determined his disability onset date (Pl.'s Mem. at 10). Mr. Guranovich argues that the onset date was in 1995, as demonstrated by his and his wife's testimony and Dr. Ballenger's repeated assessment of Mr. Guranovich's GAF at 45 or only slightly higher, and his opinion that Mr. Guranovich became unable to work as of 1995. The ALJ, however, found that treatment notes from 2003 point to significant worsening of Mr. Guranovich's impairments only two years before – which was after the last insured date of December

31, 2000 (R. 16). The ALJ also pointed to the opinion of the ME that the record evidence only shows that Mr. Guranovich's mental impairment met Listing 12.06 as of 2003 (*Id.*). In addition, the ALJ referred to Dr. Kadhodaian's June 2003 opinion that Mr. Guranovich had only mild impairment in social and occupational functions and assessed him with a GAF of 65 (R. 16-17) – which was consistent with Dr. Ballenger's January 2004 assessment of Mr. Guranovich as having a GAF of 70 (R. 306).

Social Security Regulation ("SSR") 83-20 provides that in a case such as this, where "the alleged onset and the date last worked are far in the past and adequate medical records are not available," the ALJ must infer the onset date from the claimant's alleged onset date; his work history; and the medical and other relevant evidence (including testimony of family members and friends) that describe the history and symptomatology of the disease process. SSR 83-20 requires a "legitimate medical basis" for a decision regarding when an impairment became "disabling" under the Act. *Eichstadt*, 534 F.3d at 666. A retrospective diagnosis of an impairment may be made based on contemporaneous corroboration (relating back to the claimed period of disability), including lay evidence. *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006). Contemporaneous medical corroboration of the claimant's condition is not required. *Id.* The ALJ may retain a medical expert to estimate how grave the claimant's condition was on the date last insured, or determine directly whether the claimant was totally disabled by that date after considering all the relevant evidence, including the evidence regarding the claimant's present condition. *Parker*, 597 F.3d at 925.

Mr. Guranovich argues that the ALJ failed to perform the inferential analysis outlined in SSR 83-20, instead rejecting Mr. and Mrs. Guranovich's testimony and Dr. Ballenger's opinion that his symptoms prevented him from working as far back as 1995, because there was no medical evidence

from the relevant time period (Pl.'s Mem. at 12). The ALJ did not cite SSR 83-20 in his decision, but this omission by itself is not reversible error if the ALJ properly applied the requisite analysis. *Briscoe*, 425 F.3d at 352. In *Briscoe*, the Seventh Circuit found that the ALJ did not properly apply the analysis because the medical experts were unable to establish an onset date due to the lack of medical records from the relevant time, and the ALJ failed to explore other sources of evidence, as SSR 83-20 requires, before drawing a negative inference as to the onset date. *Id.* at 353. Specifically, the ALJ failed to evaluate whether the claimant's statements about the intensity and persistence of his pain were consistent with the available evidence and supported an earlier onset date. *Id.* at 354.

Here, however, the ALJ evaluated the factors listed in SSR 83-20, including Mr. Guranovich's alleged onset date; his work history; and the medical and other relevant evidence (including testimony of family members and friends) that describe the history and symptomatology of the disease process. The ALJ considered Mr. and Mrs. Guranovich's testimony as to his symptoms during the period prior to 2000, Dr. Ballenger's opinion, and the lack of any documented work problems. The facts here are analogous to those in *Eichstadt*, where the "fundamental problem" was that the claimant did not file for benefits until more than fifteen years after her insured status expired. *Eichstadt*, 534 F.3d at 666. "Though that, in itself, d[id] not doom her application, the long lapse in time raise[d] obvious evidentiary problems." *Id.* In *Eichstadt*, the claimant's insured status expired at the end of 1987 but the claimant produced only a couple of records from 1986 and 1987 – related to dental pain and jaw surgery – which the court found did not foreshadow the fibromyalgia on which the disability claim was based. *Id.* The Seventh Circuit held that the ALJ reasonably concluded that the evidence post-dating the date last insured – while tending to suggest

that the claimant was currently disabled – failed to support the claimant's assertion that she was disabled prior to December 31, 1987. *Eichstadt*, 534 F.3d at 666. The Court held that it is "difficult to see how any medical examiner could have provided an opinion, grounded in the requisite 'legitimate medical basis,' that her now-diagnosed fibromyalgia rendered her 'disabled' as early at 1986 or 1987." *Id.* at 667 (citing SSR 83-20).[7]

The ALJ in *Eichstadt* had considered a 2005 opinion from the claimant's treating rheumatologist that the claimant's symptoms and limitations dated back prior to the date last insured. *Eichstadt*, 534 F.3d at 667. The Seventh Circuit held that the ALJ properly assigned no weight to that opinion because the doctor did not begin treating the claimant until December 1999, twelve years after the claimant's date last insured. *Id.* "What the record was missing was testimony from any physician providing anything more than conclusory support for the proposition that one might be able to infer from [the impairment] in 1999 the patient's condition in 1987." *Id.*

Although a retrospective diagnosis may be appropriate "where a disease has a well-understood progression," so that a physician examining a patient at a later time might have a good idea of what the patient's condition had been at certain time prior to the examination, *Allord*, 455 F.3d at 822, we find that the instant case is more analogous to the situation in *Eichstadt*. Here, Dr. Ballenger did not begin treating Mr. Guranovich until four years after his date of last insured,

---

[7]The Seventh Circuit has stated that SSR 83-20 only applies when an ALJ makes a finding that an individual is disabled as of an application date and the question arises as to whether the disability arose at an earlier time. *See Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004). In this case, it is unclear whether the ALJ made a determination of Mr. Guranovich's disability as of the date of his DIB application. Mr. Guranovich appears to argue that the ALJ found him disabled presently and thus had to follow the requirements of SSR 83-20, but did not. On the other hand, defendant appears to try to argue both ways – that the ALJ did not find Mr. Guranovich presently disabled and thus did not have to apply SSR 83-20, or that the ALJ did find him presently disabled and applied the requisite analysis in SSR 83-20. We need not resolve this issue here, as after careful review of the ALJ's opinion, we find that regardless of whether the ALJ determined that Mr. Guranovich was disabled presently, the ALJ reviewed the SSR 83-20 factors.

and nine years after the alleged onset date of his disability. As in *Eichstadt*, Dr. Ballenger's opinion as to the onset date of Mr. Guranovich's disability was conclusory; it does not explain the progression of Mr. Guranovich's impairment to allow an inference that the impairment became disabling before the date of last insured.

Moreover, we cannot say that Mr. Guranovich's impairments stem from diseases with a "well-understood progression," *Allord*, 455 F.3d at 822, such that one can take Mr. Guranovich's condition in 2004 and reliably infer his condition in 1995. To the contrary, the ALJ received evidence from the ME that it would be a "stretch" to attempt to draw such an inference (R. 75), and there is record evidence to support this opinion. For example, when Mr. Guranovich was first assessed in June 2003, Dr. Kadhodaian gave Mr. Guranovich a GAF score of 65 (indicating only mild impairment in social and occupational functioning), and found that he did not at that time meet the criteria for PTSD (R. 366). Moreover, when Dr. Ballenger first assessed Mr. Guranovich in January 2004, he gave Mr. Guranovich a GAF score of 70 (R. 306). Mr. Guranovich himself testified that the events of September 11, 2001, and the subsequent Iraq war triggered his PTSD (R. 71), which well post-date December 31, 2000.

Very recently, the Seventh Circuit affirmed a case where the claimant suffered from a variety of chronic illnesses, including coronary artery disease and neurological symptoms, and where the date of last insured was even closer to the date of application for benefits than in the instant case. *Martinez v. Astrue*, No. 10-2080, 2011 WL 148810, at *5 (7th Cir. Jan. 19, 2011). In *Martinez*, the Seventh Circuit affirmed the district court's affirmance of the ALJ's determination that "[i]n the brief but critical window" between the date of last insured at the end of 2003 and when the claimant applied for benefits in 2004, she was not disabled. *Id.* at *6. Although the claimant appeared to be

currently disabled, the ALJ determined that she was not disabled on the date of last insured because the claimant had reported experiencing pain from 2000 to 2003, but relied on mild pain medication to deal with it, and did a lot of farm work during that time. *Id.* In addition, the only medical opinion submitted by the claimant was from 2005 and was based primarily on examinations after 2003. *Id.* The Seventh Circuit held that the ALJ had conducted a thorough analysis in concluding that as of the date of last insured, the combination of her conditions merely limited her to performing sedentary work, which was the kind of work she had performed before she had first become seriously ill. *Id.*

As in *Eichstadt* and *Martinez*, we find that the ALJ did not err in determining that Mr. Guranovich's impairments were not disabling prior to the date he was last insured.

### C.

Next, Mr. Guranovich argues that the ALJ improperly determined that there were no limitations from his mental impairments prior to the date he was last insured (Pl.'s Mem. at 13-14). The ALJ stated that through the date he was last insured, Mr. Guranovich had severe impairments – tremors, generalized anxiety disorder, PTSD, and depression – which resulted in "more than a minimal limitation on the claimant's ability to perform work-related activities" (R. 11). Nevertheless, the ALJ ultimately concluded that "there are no limitations from his mental impairment prior to the date last insured" (R. 13, 18). Thus, Mr. Guranovich argues that the ALJ's RFC determination was inconsistent and failed to build an accurate and logical bridge between the severe mental impairments he found and the absence of mental limitations in the RFC (Pl.'s Mem. at 15).

To determine the mental RFC, the ALJ must apply the "special technique" to evaluate whether a claimant has a medically determinable mental impairment and whether the impairment

causes functional limitations. *Craft*, 539 F.3d at 674. The ALJ must then apply the "B criteria," rating the degree of functional limitation in four areas: ADLs; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* The ratings correspond to the degree of severity of the mental impairment; ratings of none or mild in the first three functional areas with no episodes of decompensation generally means the impairment is not severe. *Id.* at 675. Otherwise, the impairment is considered severe, and if it does not meet a listed mental disorder, the ALJ must assess the claimant's RFC. *Id.*

In this case, despite his conclusion that Mr. Guranovich had severe impairments "through the date last insured" (R. 11), the ALJ held that as of the date of last insured, the record showed that Mr. Guranovich had only mild restrictions in his ADLs; mild difficulties in social functioning; mild difficulties in concentration, persistence or pace; and no episodes of decompensation (R. 12-13). We agree with Mr. Guranovich that the ALJ's opinion is inconsistent on this issue.

The Commissioner argues, however, that the ALJ was merely "stating somewhat inartfully" that any limitations Mr. Guranovich had from PTSD or his other mental impairments were so mild that they did not require specific limitations to his mental RFC, and that any inconsistency constitutes harmless error (doc. # 27: Def.'s Mem. at 7-8). Indeed, the ALJ supported his statement that Mr. Guranovich had certain severe impairments through the date last insured with citations to the objective medical evidence, which, as explained above, the ALJ found was not sufficient to demonstrate that Mr. Guranovich had a disabling impairment prior to December 2000. Furthermore, the explained his determination that Mr. Guranovich had only mild restrictions in his ADLs, mild difficulties in social functioning, mild difficulties in concentration, persistence or pace, and no episodes of decompensation (R. 12-13). Thus, despite his inconsistent conclusory statement that the

41

severe impairments predated the date last insured, the ALJ in fact determined Mr. Guranovich's RFC based on the record as a whole, as he is required to do. *See Schmidt v. Apfel*, 496 F.3d 833, 845 (7th Cir. 2007). The Court finds that the ALJ's determination of Mr. Guranovich's RFC is supported by substantial evidence, and we decline to reverse or remand the ALJ's determination of Mr. Guranovich's RFC.

### D.

Mr. Guranovich also argues that the ALJ failed to address the VE testimony that if an employee raised his voice in anger twice per month (for a period of three months) at a supervisor or was absent more than ten days per year, he would likely be fired and thus Mr. Guranovich was unable to work prior to the date of last insured (Pl.'s Mem. at 15-16). The Commissioner contends that the ALJ did not need to discuss this testimony because it was not based on objective medical findings (Def.'s Mem. at 8).

An ALJ is not required to mention VE testimony rendered irrelevant by the RFC the ALJ adopts. *See Scott v. Astrue*, No. 08 C 5882, 2010 WL 1640193, at *16 (N.D. Ill. Apr. 22, 2010). As there was no testimony that Mr. Guranovich would miss more than ten days per month of work prior to the date he was last insured, the ALJ did not need to reference the VE's testimony on this subject. In addition, Mr. Guranovich testified that he had problems with supervision beginning in 1994, including run-ins with one supervisor who called him a "renegade" for opening his mouth (R. 42) and another supervisor whom he thought was going to call security on him (R. 43). Although these were examples of confrontations with supervisors, Mr. Guranovich did not testify that he raised his voice at his supervisors twice each month, and there were no evidence offered from

42

Mr. Guranovich's employment records suggesting any problems. We conclude that the ALJ did not commit error in failing to discuss this portion of the VE's testimony.

### E.

Lastly, Mr. Guranovich contends that the ALJ did not adequately support his decision to give greater weight to the opinion of Dr. Rozenfeld, the non-examining medical expert, than to Dr. Ballenger, Mr. Guranovich's treating psychologist (Pl.'s Mem. at 16). Specifically, Mr. Guranovich argues that the ALJ failed to perform the analysis required in 20 C.F.R. § 404.1527(d) after he declined to give controlling weight to the opinion of Dr. Ballenger (doc. # 31: Pl.'s Reply at 10). The ALJ determined that Dr. Ballenger's opinion was "not entitled to controlling weight," and "accorded little weight to Dr. Ballenger's opinion regarding the claimant's functional capacity prior to December 2000 because it is not supported by the other substantial evidence of record" (R. 17). Dr. Ballenger did not begin treating Mr. Guranovich until 2003, did not obtain evidence about Mr. Guranovich's impairments prior to that time other than from Mr. Guranovich, and therefore did not base his opinion "upon a detailed, longitudinal picture of the claimant's medical impairment during the relevant time period . . ." (*Id.*).

An ALJ must give a treating physician's opinion controlling weight if: "(1) the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not inconsistent with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2) (internal quotations omitted)). If the ALJ finds that the opinion is unsupported or inconsistent with the record and rejects the treating doctor's opinion, he must give a good reason. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ must consider a "checklist of factors" in making this determination, including "the length, nature, and extent of the

treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). "If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ minimally articulated his reasons . . ." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (internal quotations omitted).[8]

The ALJ's "good reason" here was similar to *Eichstadt*, where the Seventh Circuit held that the ALJ properly assigned no weight to a 2005 report from the claimant's treating rheumatologist that the claimant's symptoms and limitations dated back prior to the date last insured because the doctor did not begin treating the claimant until December 1999, twelve years after the claimant's date last insured. *Eichstadt*, 534 F.3d at 667. Mr. Guranovich argues that the ALJ failed to consider the required checklist of factors (Pl.'s Mem. at 17). Contrary to Mr. Guranovich's argument, the ALJ acknowledged the length and nature of Mr. Guranovich's treatment relationship with Dr. Ballenger. But, the ALJ found more persuasive the fact that this relationship did not begin until spring 2003 (R. 16). In addition, the ALJ found that Dr. Ballenger's opinion was inconsistent with the testimony of the ME (who noted that even Dr. Ballenger initially assessed Mr. Guranovich with a GAF of 70) and the assessment of Dr. Kadhodaian, who assessed Mr. Guranovich with a GAF of 65 (indicating only mild impairment), and the ALJ did not find support for Dr. Ballenger's opinion

---

[8]The Commissioner argues that the ALJ properly did not accord Dr. Ballenger's opinion controlling weight because – as a treater – he may harbor bias in favor of Mr. Guranovich (Def.'s Mem. at 11-12). The Commissioner cited to *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008), which held that "[t]he treating physician's opinion . . . may also be unreliable if the doctor is sympathetic with the patient and thus too quickly finds disability." *Id.* (internal quotations omitted). The ALJ, however, did not raise this in his opinion, and under the *Chenery* doctrine, the Commissioner may not use a ground to defend the agency's decision that the agency itself did not use. *Parker*, 597 F.3d at 922.

as to the onset date of Mr. Guranovich's symptoms in the record (R. 16-17). The ALJ thus satisfied the minimal articulation standard set out in *Elder.*

## CONCLUSION

We are sympathetic to Mr. Guranovich, and regret the difficulties he has encountered. But, for the reasons set forth above, we conclude that the ALJ's opinion finding that Mr. Guranovich was not disabled as of December 31, 2000, was supported by substantial evidence. We therefore deny Mr. Guranovich's motion for reversal and/or remand(doc. # 18), and we grant the Commissioner's motion to affirm (doc. # 26). The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: February 15, 2011**